**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

Civil Action No. 25-cv-02930 (DWF/ELB)

ABDIKADAR MOHAMED, and
FOWSIYA HASSAN,

           *Plaintiffs*,

v.

TIM WALZ, in his official capacity as Governor of the STATE OF MINNESOTA and
individually;
SHIREEN GANDHI, in her official capacity as Interim Commissioner of the MINNESOTA
DEPARTMENT OF HUMAN SERVICES and individually;
TIKKI BROWN, in her official capacity as Commissioner of the MINNESOTA
DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES and individually;
JENNIFER FETROW,
TWILA VILLELLA,
JOHN DOE 1-10, and
JANE DOE 1-10, individually;

           *Defendants*.

---

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

---

Plaintiffs submit this Complaint against Defendants, based on personal knowledge and upon information and belief as follows:

**INTRODUCTION**

Pursuant to longstanding stereotypes about purported corruption in the Somali immigrant community in Minnesota, the Minnesota Department of Human Services (DHS) has for many years operated under a presumption that businesses operated by Somalis that receive public funds are particularly likely to engage in fraud.  As a result, DHS licensing and fraud investigations in

Minnesota have long been disproportionately targeted against Somalis and other East African groups misperceived by DHS to be Somali.

In August 2022, agents from the Minnesota Bureau of Criminal Apprehension (BCA) used false statements that investigators had obtained video evidence tending to indicate a likelihood of fraudulent attendance records to obtain search warrants targeting multiple Somali-owned child-care centers in Minnesota. No complaints of fraud had been made against any of the targeted child-care centers and nearby child-care centers that were not Somali-owned were not targeted either for either investigation or search warrants. The search warrant affidavits also contained allegations targeted specifically at the Somali community, alleging that Somalis routinely concocted a scheme to defraud the federally funded Child-Care Assistance Program (CCAP).

During the resulting "raids," the targeted businesses were told that their ability to bill the CCAP for services was being "temporarily" suspended and the targeted providers were immediately locked out of the CCAP billing system. DHS employees nonetheless told the providers that they were required by law to continue providing services for 14 additional days to allow parents to identify alternate CCAP providers.

Because the CCAP suspension was "temporary," the targeted providers had no right of review other than simply asking DHS to change its mind, which DHS declined to do. After it became obvious that the BCA investigation was being left open even though no actual investigation was occurring, some of the targeted providers filed suit in state court to challenge the de facto shutdown of their business, but DHS claimed that the BCA's "ongoing investigation" allowed DHS to maintain the "temporary" CCAP suspension indefinitely while also permitting DHS to refuse to disclose the evidentiary basis for its allegations. DHS maintained these claims

for over two years until the providers' businesses had failed and their lawsuit had proceeded to the state supreme court.

On the eve of oral argument at the state supreme court, DHS abruptly stated that the BCA had ended its investigation and that the temporary suspension had been lifted. DHS asked the state supreme court to dismiss the providers' lawsuit as moot, assuring the state supreme court that any "eligible" billing claims that remained outstanding from the time that the providers' CCAP access had been suspended would be paid. Based explicitly on this assurance, the state supreme court dismissed the providers' appeal.

When the providers sought payment, however, DHS immediately refused, citing a statute that prohibited payment on bills submitted more than one year after services were provided. DHS also falsely claimed that the providers had not been locked out of the CCAP billing system at the time of the search warrant executions and DHS denied that its employees had directed the providers to continue providing child-care services for 14 days afterward. DHS had failed to mention this detail to the supreme court when arguing that the providers' claims were rendered moot by the long-awaited closure of the BCA investigation.

In short, acting explicitly and proudly under color of state law and exploiting the privileged status it is given under state law to regulate child-care providers and oversee child-care assistance programs, DHS has for years targeted child-care providers based on their race, ethnicity, and/or religion, denied the providers any meaningful opportunity to challenge the allegations against them until providers' businesses had already failed, and then used deception to obtain dismissal of the providers' lawsuit while denying the providers any compensation for the services that the providers had provided. This conduct blatantly, egregiously, and shamelessly violated Plaintiffs' constitutional rights.

3

Plaintiffs seek to hold Defendants accountable for these gross abuses of government authority.

**PARTIES**

1.      Plaintiff Abdikadar Mohamed (MOHAMED) is the former owner and operator of CITY CENTER Childcare Center (CITY CENTER), which operated in Hennepin County, Minnesota.

2.      Plaintiff Fowsiya Hassan (HASSAN) is the former owner and operator of SUNSHINE Child Care Center (SUNSHINE), which operated in Hennepin County, Minnesota. HASSAN is also the former owner and operator of Sunlight Child Care Center (SUNLIGHT), which operated in Hennepin County, Minnesota.

3.      Plaintiffs are both of Somali descent and most of the families served by their child-care centers were Somali.

4.      Defendant Tim Walz (WALZ) is the Governor of Minnesota and is sued in both his official capacity and his individual capacity.

5.      Defendant State of MINNESOTA is the 32nd state admitted to the Union.

6.      Defendant Shireen Gandhi (GANDHI) is the Interim Commissioner of Human Services and is sued in both her official capacity and her individual capacity.

7.      Defendant Minnesota Department of Human Services (DHS) is a state agency in Minnesota with administrative and regulatory authority over child-care providers in Minnesota until those functions were transitioned to the Minnesota Department of Children, Youth, and Families beginning in 2024.

8.      Defendant Tikki Brown (BROWN) is the Commissioner of the Department of Children, Youth, and Families and is sued in both her official capacity and her individual capacity.

4

9.      Defendant Minnesota Department of Children, Youth, and Families (DCYF) is a state agency in Minnesota with administrative and regulatory authority over child-care providers in Minnesota beginning in 2024.

10.     Defendant Jennifer FETROW (FETROW) is or was an investigator with the Minnesota Bureau of Criminal Apprehension (BCA) and is sued in her individual capacity.

11.     Defendant Twila Villella (VILLELLA) is or was an investigator with DHS and is sued in her individual capacity.

12.     Defendants John Doe 1-10 (e.g. JOHN DOE 1) and Jane Doe 1-10 (e.g. JANE DOE 1) are currently unknown individual employees of the BCA, DHS, DCYF, or other state agencies and are sued in their individual capacities.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction under 28 U.S.C. § 2201 and *Ex Parte Young*, 28 S. Ct. 441, 209 U.S. 123 (1908), as Plaintiffs allege that Official Defendants have created and enforced a system that, both facially and as-applied to Plaintiffs, violates Plaintiffs' civil rights under the Due Process Clause of the United States Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

14.     This Court has jurisdiction under 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 28 U.S.C. §§ 1331 and 1343, as Plaintiffs allege that the Individual Defendants have, under color of state law, deprived and conspired to deprive Plaintiffs of their civil rights under the Due Process Clause and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

15.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims because those claims are part of the same case or controversy that forms the basis for the Plaintiffs' federal claims.

## FACTUAL ALLEGATIONS

16.     In 2022, Plaintiffs operated licensed child-care centers providing services primarily to Somali families in Minnesota.  The care for most children in Plaintiffs' programs was paid for through the federal Child Care Assistance Program (CCAP).

17.     Under the CCAP program, parents of children requiring daycare services due to the parents' employment schedules may apply for CCAP authorization from county social-services agencies.  Once an authorization is approved, the parents present it to a CCAP-eligible child-care program, which bills the CCAP program for care actually provided.

18.     On or about August 23, 2022, agents from the Minnesota Bureau of Criminal Apprehension (BCA), supervised and directed by FETROW and accompanied and/or assisted by unknown investigative and licensing employees of DHS, the United States Secret Service (USSS), and the Federal Bureau of Investigation (FBI) executed search warrants against multiple child-care centers in the Twin Cities area of Minnesota, including those operated by Plaintiffs.  Substantively identical search warrant executions were used to obtain Plaintiffs' bank records.

19.     On arrival at Plaintiffs' child-care facilities, FETROW did not have a search warrant in-hand.  When Plaintiffs requested that she produce a warrant authorizing her entry and search, she instructed most of the officers to leave and remain outside but left other officers in possession of the facility.  FETROW proceeded to make a cell phone call and provided Plaintiffs with a copy of a search warrant approximately 30 minutes later.

20.     During the execution of the search warrant on CITY CENTER, FETROW and other unknown law-enforcement officers destroyed MOHAMED's security camera for the facility, forced MOHAMED and other employees to stand against a wall, seized MOHAMED's phone to

6

prevent MOHAMED from calling an attorney, and asked MOHAMED questions seeking to elicit inculpatory information without providing required *Miranda* warnings.

21.     Plaintiffs later discovered that multiple other child-care centers, all owned by Somalis, had been targeted for search warrants at the same time.  The search warrant affidavits supporting the BCA's search-warrant applications for all of these simultaneously targeted child-care centers were attested to by FETROW and contained on allegations that investigators had used hidden cameras focused on the entryways of the targeted child-care facilities to determine that the number of children arriving did not match the number of children for which the facility purportedly billed.  With the exception of the numbers of children listed in single chart in the search warrants, each of the search warrants attested to by FETROW was nearly word-to-word identical and appeared to be a "cut-and-paste" document.

22.     On information and belief, the information contained in FETROW's search-warrant applications was based upon information FETROW received from DHS investigators, including VILLELLA.

23.     On information and belief, the information in FETROW's search-warrant affidavits was either false or intentionally misleading.  Despite the multiple child-care centers purportedly targeted for hidden-camera investigations at the same time as Plaintiffs', no independent witnesses have been identified claiming to have observed any activity or equipment consistent with placement, access, or removal of cameras focused on the entryways of the targeted centers.  Also, neither the BCA nor DHS has produced search warrants authorizing the placement of cameras on the private property proximate to the targeted child-care centers and Plaintiffs have been able to find no such search warrants in publicly available court records.  And the configuration of

Plaintiffs' facilities makes it implausible that such cameras could have been installed on nearby public property without being noticed.

24.     Upon information and belief, all of the targeted child-care centers, including Plaintiffs', were owned and operated by persons of Somali descent and were identified for investigation solely or primarily based on that ownership and Defendants' belief that businesses owned by members of the Somali community were automatically suspect. The search-warrant affidavits also did not detail any complaints or other basis upon which the targeted childcare centers were originally identified for the purported investigation.

25.     The exclusive targeting of Somali-owned child-care providers on August 23, 2022 is part of a longstanding, stark, and continuing pattern of DHS and DCYF officials targeting Somali child-care providers almost exclusively for investigation of purported CCAP fraud and for purported licensing violations.  Specifically, DHS and DCYF have since at least 2017 targeted Somali-owned child-care providers almost exclusively for investigations related to allegations of CCAP fraud; CCAP-eligible providers who are not Somali are rarely if ever targeted for investigation.

26.     DHS and DCYF have also shown a stark pattern of harsher investigative practices against Somali-owned providers, including pre-deciding the outcome of investigations.  For example, when the providers targeted for investigation are Somali, DHS and DCYF investigators have shown a pattern of intentionally limiting their investigations to the obtaining of inculpatory information while refraining from asking questions that would allow the targeted providers any opportunity to substantively address any areas of potential concern prior to being targeted with a "temporary" payment withholding or other sanction.  Additionally, when Minnesota law requires DHS and DCYF to allow providers to submit information to DHS/DCYF and request

8

administrative reconsideration, DHS/DCYF routinely refuse to give good-faith consideration to information provided, instead consistently drawing every possible inference against Somali providers in order to justify a preordained decision to find evidence of fraud.

27.    DHS/DCYF along with other government officials in Minnesota have a known history of negative stereotypes and expressions of animus towards the Somali community, particularly regarding Somali-operated child-care centers receiving CCAP payments.  *See, e.g.*, John Bowden, *Minnesota Probe Finds No Evidence Day Care Fraud Was Funneling Money to Terrorists*, The Hill, March 13, 2019, *available at* https://thehill.com/homenews/state-watch/433950-minnesota-investigation-concludes-day-care-fraud-not-funneling-money-to/; Ibrahim Hersi, *How a New Group Is Trying to Counter Negative Perceptions About Somali-American Day Cares in Minnesota*, Minn. Post, June 30, 2017, *available at* https://www.minnpost.com/new-americans/2017/06/how-new-group-trying-counter-negative-perceptions-about-somali-american-day-ca/.

28.    The inference that Plaintiffs' child-care centers were targeted solely or primarily because of their perceived Somali ownership is supported by a stark pattern of apparently discriminatory enforcement actions taken against Somali-owned license-holders over the course of at least the past decade.  Specifically, all five appellate cases dealing with DHS allegations of CCAP fraud at child-care centers since 2016 involved providers with Somali ownership.  *See Sunshine Childcare Center, LLC v. Ramsey Cnty.*, 7 N.W.3d 611, 613 (Minn. Ct. App. 2024) (Plaintiffs here); *Anoka Cnty. v. Hersi*, No. A22-1208, 2023 WL 4417380, at *1 (Minn. Ct. App. July 10, 2023) ("Kadar Hersi"); *Gayre v. Minnesota Dep't of Hum. Servs.*, No. A20-1015, 2021 WL 1733370, at *1 (Minn. Ct. App. May 3, 2021) ("Abdirizak Gayre"); *Samiras Day Care Ctr. v. Minnesota Dep't of Hum. Servs.*, No. A18-1170, 2019 WL 178557, at *1 (Minn. Ct. App. Jan.

9

14, 2019) ("Samiras Day Care Center"); *Kind Heart Daycare, Inc. v. Comm'r of Hum. Servs.*, 905 N.W.2d 1, 4 (Minn. 2017) ("Yasmin Salim").

29.     Additional examples of this stark discriminatory pattern shown by DHS and DCYF in its investigations of allegations of CCAP fraud emerged in late 2025 and early 2026, when an internet troll named Nick Shirley with a history of making anti-Somali and anti-Muslim statements and acting at the behest of Minnesota House Speaker Lisa Demuth targeted numerous Somali-owned CCAP providers, resulting in a series of viral internet videos generally alleging rampant fraud among Somali child-care facilities.  The Shirley videos prompted the President of the United States to condemn all Somalis in Minnesota as "garbage" and resulted in thousands of death threats directed towards Somalis who operated child-care or health-care programs in Minnesota.

30.     The Shirley video also prompted federal officials to try to cut off all CCAP funds to Minnesota.  Although DCYF initially announced that it had visited each of the child-care facilities targeted by the internet troll and found "no evidence of fraud," *see* Howard Thompson, *YouTuber Nick Chirley Returns to Minneapolis Day Care After Viral Fraud Video*, Fox 9 News, Dec. 30, 2025, https://www.fox9.com/news/youtuber-nick-shirley-returns-minneapolis-day-care-after-viral-fraud-video, DCYF responded to the threatened cutoff of federal funds by targeting those same Somali-owned facilities for temporary payment withholds and other sanctions based on "credible allegations of fraud," accompanied by sham investigations with no substantive opportunity for the providers to defend themselves before DCYF reached its predetermined conclusions that fraud had in fact occurred.

31.     The same pattern of selective targeting against Somalis shown by DHS and DCYF regarding child-care centers is found in other areas of DHS enforcement as well.  For example, beginning in 2022, DHS initiated a targeted licensing enforcement campaign in Olmsted County

against operators of adult foster-care (AFC) facilities.  The campaign was directed by state DHS headquarters and conducted by state DHS investigators even though AFC licensure in Minnesota is primarily the responsibility of county social-services agencies.  Although Somali providers accounted for approximately 30% of AFC providers in Olmsted County, *every single one* of the initial targets for investigation selected by the responsible state DHS licensing official was owned by a Somali person and *all* of the targeted providers were hit with license-revocation proceedings. And when one provider successfully argued that DHS's selected sanction of license revocation contrasted with more lenient sanctions against non-Somali providers with similar purported violations, the DHS commissioner removed the administrative law judge's finding from the commissioner's final order while refusing to provide any reason for doing so.

32.    The inference of discriminatory intent at DHS is also supported by other evidence, including DHS's continuing resistance to discovery requests that seek to document racial and ethnic enforcement patterns.  Specifically, DHS has uniformly opposed all requests that it disclose racial/ethnic enforcement patterns in administrative hearings by citing Minn. Stat. § 256.045, which removed most categories of administrative hearings involving purported fraud allegations from the "contested case hearing" category where procedures akin to civil discovery are permitted and into the "revenue recapture rules" category of hearing where discovery is strictly limited to issues.  DHS also cites excessive costs as a reason for refusing data-practices requests seeking disclosure of its patterns of selecting targets for enforcement.  Simply put, DHS shows an awareness of its pattern of discriminatory enforcement by actively resisting any and all efforts by persons investigating such matters to obtain *any* accounting of DHS's internal enforcement criteria.

33.     Concurrently with or shortly after the search-warrant executions against Plaintiffs, DHS served facility representatives present with notices that their eligibility for payment through the Child Care Assistance Program (CCAP) was being suspended "temporarily" under Minn. Stat. 245E.02 (2022) due to DHS's determination that the facilities had provided "materially false" billing information.  The notices were explicitly based on the information contained in the search warrant applications.

34.     The notices stated that the "temporary" CCAP suspension would be effective September 1, 2022, which effectively prevented the facility operators for billing for services that had already been provided, because September 1, 2022 fell towards the end of the biweekly CCAP billing cycle ending on September 4 and because DHS immediately locked the targeted facilities out of the CCAP billing system, which prevented the facilities from submitting out-of-cycle billing before September 1, 2022.

35.     DHS licensors had previously told Plaintiffs that, if authorized services to eligible families were ever lost for any reason, the child-care providers were required to continue providing CCAP-funded services to affected families for 14 days after service of the "temporary" CCAP suspension notices, to allow the affected families time to find alternative placements for their children.  In compliance with these instructions, Plaintiffs continued to provide child-care services after receiving notice of their "temporary" suspension of CCAP eligibility because they reasonably believed that they were required to do so to avoid further sanctions.  Since few if any of the affected families were able to find alternative placement within the 14-day period and because Plaintiffs were locked out of the CCAP billing system, Plaintiffs provided an additional 10 days of child-care services that would normally be billable to the State for their entire roster of previously eligible clients.

36.     Based on its longstanding regulatory and licensing authority over child-care centers and its administration of the CCAP program, DHS had actual knowledge that child-care facilities serving the Somali community in Plaintiffs' area of operation had little access to "private pay" clients and thus any lengthy suspension of CCAP eligibility imposed on those facilities would have the practical effect of putting the targeted facilities out of business.

37.     As the BCA's and DHS's purported investigations dragged on and the "temporary" suspension of their CCAP eligibility remained in place, Plaintiffs sought declaratory judgment in state court that the indefinite "temporary" suspension of their CCAP eligibility without imposition of a sanction that allowed for administrative and judicial review violated due process as applied to Plaintiffs.  During those proceedings, Defendants refused to provide copies of the purported hidden-camera footage or other evidentiary basis for DHS's claimed fraud determination stated in the notices, claiming that they were not required to provide information related to an ongoing criminal investigation.

38.     On information and belief, BCA's and DHS's claim that there was an ongoing criminal investigation was a sham.  There is no evidence, such as interviews of witnesses, indicating that either the BCA or DHS was actively pursuing an ongoing investigation during the period that Plaintiffs were "temporarily" barred from CCAP eligibility.  Instead, it appears the BCA and DHS kept the investigation open for the primary purposes of ensuring that Plaintiffs' businesses would fail while avoiding disclosure of the lack of evidentiary foundation for their fraud allegations.  The lack of evidence of any ongoing investigation, coupled with DHS's actual knowledge of the real-world effects of a "temporary" CCAP suspension, justifies the inference that DHS kept the investigation open intentionally for the primary purpose of ensuring that

Plaintiffs' business would fail in such a way as to prevent Plaintiffs from ever having opportunity to substantively defend themselves.

39.     During the pendency of the purported investigation, Plaintiffs' businesses did in fact fail due to the lack of "private pay" clients and DHS's requirement that child-care licenses that are not used to serve any clients for 12 months can be administratively closed and that the license-holder would have no right to create a record of the reasons for DHS's closure of their license in an administrative appeal.  *See* Minn. Stat. § 142B.25.

40.     Other providers attempted to administratively appeal similar "temporary" CCAP suspensions.  Those appeals were either dismissed on jurisdictional grounds or the targeted providers were granted settlement agreements that allowed them to reopen.  In all cases, DHS and BCA intentionally avoided disclosure of the evidentiary basis for its search-warrant applications. Based on this nondisclosure pattern and other information regarding DHS enforcement patterns, Plaintiffs believe that the factual allegations made in the search warrant applications were knowingly false and that DHS's and BCA's actual motivation was racial, ethnic, or religious prejudice against East African service providers.

41.     After the state district court granted summary judgment to DHS, Plaintiffs appealed and the intermediate state court of appeals affirmed.  *See SUNSHINE Childcare Center, LLC v. Ramsey Cnty.*, 7 N.W.2d 611 (Minn. Ct. App. 2024).  Specifically, the court of appeals ruled that, because Minnesota's CCAP statute allows the state to suspend CCAP payments without review, Plaintiffs had no property interest in those payments that was protected by the Due Process Clause. *See id.* at 617.  The court of appeals also relied on the general notion that "those actions do not prevent [Plaintiffs] from operating a licensed childcare center during the investigation," ignoring the particular circumstances of providers serving the Somali community in Minnesota.  *See id.* at

14

617-18. And although the court of appeals opined that it was "troubling that the investigations into this matter have taken over a year with no concrete results," it held that the delay did not create a due process issue because Minnesota's CCAP statutes did not establish a deadline for fraud investigations. *See id.* at 618 (contrasting the lack of deadline for fraud investigations with the statutory requirement that payments withheld for violations of CCAP program rules could be withheld for only 90 days "after the condition has been corrected"). In short, the court of appeals held that Minnesota's statutory scheme provides that DHS is immune from due process claims for indefinite withholding of CCAP payments, provided that DHS withholds those payments pursuant to a claim of fraud, regardless of whether DHS ever produces any evidence of fraud and that providers are without judicial or other remedy for such withheld payments.

42.     The state supreme court accepted discretionary review but, very shortly before the scheduled oral argument, the BCA abruptly closed its investigation without any finding of wrongdoing on the part of Plaintiffs. *See Sunshine Childcare Center, LLC, et al., v. Ramsey Cnty., et al.*, A23-1595, at *1 (Minn. Dec. 20, 2024) (order). DHS also did not make any allegations of wrongdoing and it did not order a permanent CCAP disqualification against Plaintiffs nor seek recovery of overpayments to Plaintiffs' facilities, both of which would have been appealable. Instead, DHS moved the state supreme court to dismiss Plaintiffs' appeal as moot. *See id.* at *2. Relying solely on DHS's averments, *see id.* at *2 n.1, the state supreme court held that Plaintiffs' appeal was now moot because "payments due will be processed." *See id.* at *3. The state supreme court also held that the voluntary-cessation exception to mootness did not apply because "this is not a case where we are concerned that DHS withdrew the holds and agreed to reverse the Centers' eligible payments as a litigation strategy to avoid an adverse decision" and that the proximity in

15

time to the BCA's closure of its investigation and the oral argument date was merely "a coincidence." *See id.* at *4-5.

43.     After BCA closed its investigation, at least one of Plaintiffs' cases was referred to the Hennepin County Attorney's Office (HCAO) for potential criminal prosecution.  The HCAO declined to prosecute, however, because DHS refused to disclose critical information about its investigation underlying the BCA investigation.  In short, DHS withheld the same information from HCAO that it maneuvered to avoid disclosing to Plaintiffs, justifying the inference that the information underlying the search warrant applications was false and that VILLELLA and/or FETROW knew it.  Upon information and belief, DHS's claimed reason for withholding the information—that disclosure would somehow render DHS an agent of the BCA—was knowingly false and baseless, because DHS has freely shared similar information with the BCA and other law-enforcement agencies in numerous other cases.

44.     DHS's subsequent actions further illustrated that the timing of BCA's closure of its investigation and DHS's motion to dismiss was not a coincidence.  DHS revealed its deception of the state supreme court shortly thereafter.  After obtaining dismissal of Plaintiffs' appeal based on its assurance that it would reimburse Plaintiffs for their "eligible" billings, DHS denied Plaintiffs' requests for payment of the 24 days of child-care services that they had provided by asserting that the claims were ineligible for reimbursement because they had not been submitted within one year of the provision of services.  *See* Minn. Stat. § 142E.17, subd. 9(b).  Although it clearly relevant to their mootness motion, DHS had omitted mention of this limitation when arguing for dismissal of Plaintiffs' claims on mootness grounds.    DHS also falsely claimed that it had permitted Plaintiffs to bill for services before their access was lost to the CCAP billing system and that it had never told Plaintiffs that they were obligated to provide 14 days of ongoing services after receiving

the CCAP suspension notices.   The net effect of DHS's actions was thus to intentionally manipulate Minnesota's statutory scheme for management of CCAP funds to force the closure of Plaintiffs' businesses and withhold tens of thousands of dollars for services actually provided without ever disclosing an evidentiary basis for its actions and without ever allowing Plaintiffs any opportunity to be heard.

## CLAIMS FOR RELIEF

**COUNT ONE: SELECTIVE DISCRIMINATORY ENFORCEMENT (as to GANDHI and BROWN)**

1.      Plaintiffs repeat the allegations in paragraphs above as if fully set forth herein.

2.      GANDHI and BROWN, as commissioners of DHS and DCYF, respectively, have individual liability for the actions alleged above by DHS because GANDHI and BROWN each has throughout their tenure had actual or constructive knowledge of the stark patterns of discrimination alleged herein but have exercised deliberate indifference towards the patterns. Specifically, both GANDHI and BROWN had actual and constructive knowledge that allegations of selective discriminatory enforcement were being made regarding DHS's enforcement patterns yet took no action to root out, eliminate, or even mitigate the patterns from continuing.

3.      In BROWN's case, the issue of discriminatory enforcement patterns was specifically addressed in confirmation hearings and media coverage surrounding her appointment, yet BROWN has continued preexisting patterns of tacit approval for race-based targeting of Somalis, particularly in the aftermath of the Shirley videos.

4.      GANDHI and BROWN are also individually liable because each has, upon being made aware of patterns of selective discriminatory enforcement, failed to take any remedial action and each has instead implicitly yet repeatedly endorsed and ratified those actions.

17

5.      GANDHI has also shown personal involvement in attempts to cover-up evidence of racially discriminatory enforcement patterns by personally removing the finding of discriminatory enforcement patterns from an ALJ's report and recommendation without explanation.

6.      The stark pattern of selective targeting of child-care centers and other facilities owned and operated by Somali persons, combined with their institutional history of suspicion and animus towards the Somali community justifies the inference that Plaintiffs were selected for investigation based on their race, ethnicity, and/or religion.

7.      The inference that Defendants' had a discriminatory intent in targeting Plaintiffs is supported by their agencies' longstanding pattern of legal machinations to avoid disclosure of the evidentiary basis for their search-warrant applications and  the historical pattern of their agencies of avoiding disclosures that might allow potential plaintiffs to discover enforcement patterns.

8.      Such a basis for selecting Plaintiffs for investigation violated Plaintiffs' civil rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, regardless of whether any evidence of misconduct was or might have been revealed as a result of the investigation.

9.      Because Defendants' conduct violated Plaintiffs' civil rights, Plaintiffs are entitled to an award of nominal compensatory damages.

10.      Defendants' conduct resulted in the loss of Plaintiffs' businesses, with an estimated value of $13,000,000, plus the known loss of continuing income from their businesses for a period of two years in the amount of $2,600,000.  Plaintiffs are therefore entitled to an award of actual special damages in the amount of $15,600,000 plus an additional award of compensatory damages in the amount of $31,200,000 for mental anguish and suffering, *see* Minn. Stat. § 363A.33, subd.

8(a) (authorizing compensatory damages for mental anguish resulting from discrimination at an amount "three times the actual damages sustained"), resulting in a total compensatory damages award of $46,800,000.

11.     Plaintiffs are also entitled to an award of attorney's fees under 42 U.S.C. § 1988.

**COUNT TWO: DENIAL OF PROCEDURAL DUE PROCESS (AS-APPLIED) (as to official-capacity Defendants (prospective relief only) and WALZ, GHANDI, BROWN, John Doe 1-10, and Jane Doe 1-10, individually (damages))**

12.     Plaintiffs repeat the allegations in paragraphs above as if fully set forth herein.

13.     Minnesota's statutory scheme allowing indefinite suspensions of eligibility for CCAP payments, allowing closure of child-care licenses after one-year of disuse, denying administrative or judicial review of indefinite suspensions of eligibility for CCAP payments, denying subjects of indefinite suspensions of CCAP eligibility access to the evidentiary basis for the suspensions, prohibiting suspended CCAP providers from billing for services provided more than one year after the date of service provision, and permitting DHS to avoid administrative or judicial review of its nonpayment for CCAP services by closing an investigation more than one year after the last date of service provision creates an exploitable process that implicates child-care providers' protected liberty interests in the operation of their businesses and providers' property interests in receiving compensation for services provided prior to and after receiving a notice of indefinite CCAP suspension.

14.     The essence of constitutional due process is the right to be heard at a meaningful time and in a meaningful manner before the government can take any action affecting a protected liberty interest or a protected property interest.  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Because Minnesota's scheme prevents child-care providers from being heard indefinitely—and

19

potentially eternally— by any independent fact-finder regarding the evidentiary basis for DHS's decision to withhold payment, it fails to provide hearing at *either* a meaningful time or in a meaningful manner.  As such, it violates the basic requirements of constitutional due process under the Fourteenth Amendment to the United States Constitution.

15.     Plaintiffs are therefore entitled to prospective relief in the form of a judgment declaring Minnesota's statute denying eligibility for CCAP reimbursements submitted more than one year after services are provided is unconstitutional as-applied to the facts of this case, where the reason for the failure to submit the reimbursement request is DHS's use of a "temporary" CCAP suspension pursuant to an investigation that extended more than one-year in length and an injunction barring Minnesota from using this statutory provision to deny payment for CCAP services actually provided in the future.

16.     Plaintiffs are also entitled to an award of compensatory damages payable by John Doe 1-10 and/or Jane Doe 1-10, as those individuals are the persons who, acting under color of state law, make the actual decision to withhold payment  with actual knowledge that DHS had represented to the Minnesota Supreme Court that Plaintiffs would be paid.

17.     Plaintiffs are also entitled to an award of compensatory damages payable by WALZ, GHANDI, and BROWN because those Defendants, acting with deliberate indifference after being placed on notice by Plaintiffs' request for payment made to the Minnesota Supreme Court where WALZ, GANDHI, and BROWN had appeared through counsel provided by the Minnesota Attorney General's Office, frustrated Plaintiffs' constitutional due-process rights by permitting DHS/DCYF to refuse payment for Plaintiffs' provision of 24-days of services even after DHS had told the Minnesota Supreme Court that DHS would make payment for such services and thereby obtained dismissal of Plaintiffs' state-court appeal.

20

18.     Plaintiffs are also entitled to an award of punitive damages against any or all Individual Defendants in an amount to be determined at trial because Individual Defendants' conduct of deliberately misleading the Minnesota Supreme Court in order to obtain dismissal of Plaintiffs' state-court action demonstrated intentional and/or reckless or callous indifference to Plaintiffs' constitutional due-process rights.

19.     Plaintiffs are further entitled to an award of reasonable attorney's fees under 42 U.S.C. § 1988.

### COUNT THREE: FOURTH AMENDMENT VIOLATIONS (as to FETROW, VILLELLA, John Doe 1-10, and Jane Doe 1-10)

20.     Plaintiffs repeat the allegations in paragraphs above as if fully set forth herein.

21.     Defendants' machinations to prevent disclosure of the evidentiary foundation for their allegations of fraud contained in the search-warrant affidavits, the absence of any evidence that the purported hidden-camera investigations ever actually occurred, Defendants' excessive length of time purportedly investigating allegations that Defendants' search-warrant applications indicated were already proven, and Defendants' ultimate failure to pursue either criminal charges or administrative sanctions such as permanent CCAP disqualification, overpayment recovery, or licensing sanctions justifies the inference that Defendants' actual purpose was to avoid disclosing the fact that the allegations in the search-warrant affidavits were intentionally fabricated or misleading.

22.     Defendants' use of false allegations in a search-warrant application to gain access to Plaintiffs' businesses and personal records, constituted a violation of Defendants' Fourth Amendment rights, entitling Defendants to an award of nominal damages.

23. Defendants' conduct resulted in the loss of Plaintiffs' businesses, with an estimated value of $13,000,000, plus the known loss of continuing income from their businesses for a period of two years in the amount of $2,600,000. Plaintiffs are therefore entitled to an award of actual special damages in the amount of $15,600,000 plus an additional award of compensatory damages in the amount of $31,200,000 for mental anguish and suffering, *see* Minn. Stat. § 363A.33, subd. 8(a) (authorizing compensatory damages for mental anguish resulting from discrimination at an amount "three times the actual damages sustained"), resulting in a total compensatory damages award of $46,800,000.

24. Plaintiffs are also entitled to an award of reasonable attorney's fees under 42 U.S.C. § 1988.

**COUNT FOUR: DUE PROCESS RETALIATION (by Plaintiff HASSAN as to WALZ, GANDHI, BROWN, John Doe 1-10, and Jane Doe 1-10)**

25. Plaintiffs repeat the allegations in paragraphs above as if fully set forth herein.

26. After the present lawsuit was filed, HASSAN received notices from DCYF alleging overpayment determinations and an administrative disqualification from CCAP regarding a child-care business she had co-owned prior to owning SUNSHINE, called Sunlight Child Care Center, Inc.

27. The notices were based on allegations that DHS investigators had visited Sunlight on two days nearly six years before the issuance of the notices, finding the doors locked and that HASSAN's co-owner had failed to answer phone calls. The notices also generally alleged, without detailing any evidentiary basis, that Sunlight had "only hired employees who had children that were eligible for CCAP with the intent to obtain CCAP funds." The notices stated that HASSAN would be barred from receiving CCAP funds for three years, would be impaired by a fraud finding

that could prevent her from obtaining employment in child-care or related fields, and would be required to repay $240,592.45 to DHS.

28.     The timing of the notices, coming almost six years after alleged conduct and in the absence of any indication that any investigation was ongoing or any other apparent reason for the six-year delay, the lack of any apparent interest by DHS in pursuing the matter prior to the initiation of this lawsuit, DHS's earlier conduct of misleading the Minnesota Supreme Court to obtain dismissal of HASSAN's lawsuit under the false pretense that HASSAN would be paid for services she actually provided, and the fact that the notices relate to a business that was closed long before the events giving rise to this litigation justifies the inference that DHS sent the notices primarily to retaliate against HASSAN for having brought this litigation, in violation of HASSAN's constitutional due process rights.

29.     HASSAN is therefore entitled to an award of compensatory damages payable by WALZ, GANDHI, BROWN, and/or John Doe 1-10 and/or Jane Doe 1-10, as those individuals are the persons who, acting under color of state law, make the actual decision to target HASSAN for retaliation, knowing that HASSAN was exercising her constitutional due-process rights.

30.     HASSAN is also entitled to an award of compensatory damages payable by WALZ, GANDHI, and BROWN because those Defendants, acting with deliberate indifference after being placed on notice by Plaintiffs' initial complaint, permitted lower-level DHS/DCYF employees to target HASSAN in retaliation for the exercise of her constitutional due-process rights.

31.     HASSAN is also entitled to an award of punitive damages in an exact amount to be proven at trial because Defendants' conduct was motivated by evil motives, namely, the desire to punish exercise of constitutional due-process rights and/or the desire to target HASSAN as a member of a racial group that was already under severe persecution at the time.

23

**JURY DEMAND**

Plaintiffs demand a jury trial to the extent allowed by law.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court award Plaintiff:

(1) Compensatory and special damages as set forth above, in an amount up to $46,800,000, plus punitive damages;

(2) Declaratory and injunctive relief;

(3) reasonable attorney's fees as allowed by law;

(4) costs and disbursements incurred in this action;

(5) prejudgment and postjudgment interest at the highest lawful rates; and

(6) such further relief as Plaintiff may be entitled and which the Court deems just and proper.

Dated:    04/22/2026                           /s/ Jason Steck
                                         Jason Steck #0393077
                                         Attorney for Plaintiffs
                                         6160 Summit Drive North, Suite 220
                                         Brooklyn Center, MN 55430
                                         jason@jasonstecklaw.com
                                         (763) 402-1829

24